IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

JULIA MANNARINO and RON TESKA,       )
                Plaintiffs,                )
                            )
                            )
        vs.                              )      Civil Action No. 08-988
                            )
UNITED STATES DEPARTMENT OF          )
HOUSING AND URBAN                    )
DEVELOPMENT and KIM KENDRICK,        )
Assistant Secretary for Fair Housing and )
Equal Opportunity,                   )
                Defendants.                )

MEMORANDUM OPINION

       Plaintiffs, Julia Mannarino and Ron Teska, proceeding pro se, bring this action against

Defendants, the United States Department of Housing and Urban Development ("HUD") and

Kim Kendrick, acting in her official capacity as Assistant Secretary for Fair Housing and Equal

Opportunity at HUD, alleging a claim under the Administrative Procedures Act, 5 U.S.C. §§ 701-

06 ("APA").  They seek review of HUD's investigation of the failure of Dunkard Township and

the Pennsylvania Department of Community and Economic Development ("DCED") to comply

with section 3 of the Housing and Urban Development Act of 1968, 12 U.S.C. § 1701u.

Plaintiffs operated a "section 3 business concern" known as Southwestern Community Ventures

("SCV"), which entitled them to priority in the awarding of contracts paid for by Community

Development Block Grant ("CDBG") funds.  In 1997, Plaintiffs filed a complaint with HUD

raising the section 3 violations by Dunkard Township and the DCED.  HUD did not act on

Plaintiffs' complaint until December 2006, when it issued a determination that Dunkard

Township had violated section 3.  In 2008, HUD imposed a resolution against the DCED.

Plaintiffs were dissatisfied with the resolution because the lengthy delay contributed to the

dissolution of SCV and because they contend that the resolution did not "mitigate" the effects of Dunkard Township's actions because it provided only that all sub-recipients in the jurisdictions where SCV qualified as a section 3 business issue pre-bid invitations to SCV and set priority preference to bid proposals submitted by SCV for three years even though SCV had long been out of business.  Plaintiffs requested that monetary sanctions be imposed on Dunkard Township, but HUD responded that it had no authority to do so.

Presently before this Court for disposition is a motion for summary judgment, brought by Defendants.  For the reasons that follow, the motion will be granted.

Facts

Plaintiffs state that they established SCV as a partnership in 1989 and filed its last income tax return in 2003.  (Compl. ¶ 4).  In 1997, Julia Mannarino, d/b/a SCV, filed a complaint with HUD alleging that the Dunkard Township Supervisors and the DCED violated section 3 of the Housing and Urban Development Act of 1968, 12 U.S.C. § 1701u.  Plaintiffs allege that when Dunkard Township received CDBG funds in 1996 from the DCED (which, in turn, received those funds from HUD), Dunkard improperly failed to solicit bids from section 3 business concerns, including SCV.  (Defs.' App. Ex. A at 1.)[1]

Plaintiffs' complaint with HUD was originally filed on January 28, 1997 and it was refiled on July 21, 1997.  (Pls.' App. Ex. A.)[2]  HUD initially dismissed Plaintiffs' complaint on April 30, 1998, for lack of jurisdiction, but it notified them on June 23, 1998, that it had reopened its investigation as it had become aware of additional information.  (Pls.' App. Exs. I,

---

[1]      Docket No. 23.

[2]      Docket No. 28.

2

J.)  Plaintiffs alleged that HUD took no further action on its complaint.

According to HUD's documentation, the case was dismissed a second time on September

7, 2004, but was once again reopened on successful appeal by SCV.  (Pls.' App. Exs. K, L.)[3]

Plaintiffs allege that during this lengthy period of time, DCED continued to send federal funds to

Dunkard Township.  (Pls.' App. Ex. H.)

Finally, on December 15, 2006, HUD issued a determination that "Dunkard violated 24

CFR § 135.9(b)(2) by failing to provide contracting opportunities, to the greatest extent feasible,

to Section 3 business concerns such as your company, [SCV]."  (Defs.' App. Ex. A; Hampton

Decl. ¶ 5.[4])

Assistant Secretary Kim Kendrick attempted an informal resolution in May 2007 by

sending Plaintiffs a draft Voluntary Compliance Agreement ("VCA").  (Defs.' App. Ex. B.)  On

May 30, 2007, Plaintiffs sent a letter to HUD with their comments.  They objected to the fact that

the proposed VCA addressed only future violations by Dunkard Township and made no effort to

relieve the effects of past violations that resulted in the grievance and finding of non-compliance.

They also noted that the VCA overlooked any responsibility of DCED and erroneously included

a space for County officials to sign when they had no involvement in the events underlying the

grievance.  (Defs.' App. Ex. C.)

Because Plaintiffs rejected the terms of the proposed VCA, HUD imposed a resolution in

---

[3]     The Determination Letter dated December 15, 2006 indicated that the case "was dismissed a second time on September 17, 2004, but was once again ... reopened on successful appeal by [SCV.]" (Defs.' App. Ex. A at 1.)  However, Plaintiffs have produced the actual letter in which they were informed of the second dismissal and it is clearly dated September 7, 2004. (Pls.' App. Ex. K.)

[4]     Defs' App. Ex. E.

the matter on January 3, 2008.  (Defs.' App. Ex. D; Hampton Decl. ¶¶ 6-9.)  The Imposed

Resolution requires the DCED to train all sub-recipients (such as Dunkard Township) receiving

section 3 covered funds on the administration and implementation of HUD's section 3 program.

(Defs.' App. Ex. D ¶ II.B.)  The Imposed Resolution also requires the DCED to submit plans to

HUD concerning how they intend to ensure that sub-recipients comply with section 3

requirements, and that they sponsor training for all communities within its jurisdiction

concerning the section 3 program.  (Id. ¶ III.1.)  The Imposed Resolution requires that all

sub-recipients in the jurisdictions where SCV qualifies as a section 3 business issue pre-bid

invitations to SCV, and provide priority preference to bid proposals submitted by SCV for three

years.  (Id. ¶ III.4.)

Plaintiffs received a copy of the Imposed Resolution and on January 14, 2008, they filed

an appeal therefrom.  They noted that the VCA directed compliance by DCED and not Dunkard

Township, that SCV had been forced out of business several years before and thus HUD's relief

was no longer a viable option, and that they had not been consulted during the entire

investigation.  They requested monetary compensation as relief.  (Defs.' App. Ex. F.)

On March 3, 2008, Kim Kendrick responded to Plaintiffs' appeal as follows: 1) DCED

was the primary recipient of section 3 covered financial assistance and was ultimately responsible

for ensuring that the township complied with the statutory and regulatory requirements of section

3; 2) the regulations do not provide for monetary compensation in an imposed resolution; and 3)

Plaintiffs had submitted comments in response to the draft VCA on May 30, 2007 and HUD had

presented them to DCED but was unable to negotiate a voluntary resolution.  Kendrick invited

Plaintiffs to submit recommendations for alternative types of relief other than monetary

compensation.  (Defs.' App. Ex. G.)

Plaintiffs submitted a letter in response on March 24, 2008, in which they requested a hearing before an impartial decision maker and reiterated the arguments that Dunkard Township was not being required to mitigate its past actions, that they were not consulted during the VCA process and that monetary sanctions are not prohibited by statute or regulations and are therefore permissible.  (Defs.' App. Ex. H.)  On June 16, 2008, Kendrick responded as follows: 1) she stated that neither the statute nor the regulations provide for administrative hearings in conjunction with the investigation or resolution of section 3 complaints and thus their request for a hearing was denied; 2) the HUD Handbook Plaintiffs cited listed several types of relief that "may" be available to a grievant through section 3 conciliation agreements, but provides for monetary compensation only if all parties to the complaint agree and DCED did not (although HUD had advocated for DCED to pay monetary sanctions); 3) HUD's strategy for the VCA process is to present a draft VCA to all parties for their review and consideration and thus Plaintiffs did have the opportunity to participate in the process; and 4) because neither the section 3 statute nor the implementing regulations expressly cover the award of monetary compensation as a result of findings of non-compliance in section 3 investigations, HUD is limited to imposing sanctions listed in the regulations, namely "debarment, suspension and limited denial of participation in HUD programs."  (Defs.' App. Ex. I) (quoting 24 C.F.R. § 135.76(g).)

Plaintiffs submitted a final letter to HUD on June 20, 2008.  In it, they acknowledged that their administrative remedies through HUD had been exhausted, but reiterated the complaints that Dunkard Township was not being included as a party to the final resolution and that the terms of the imposed resolution would in no way mitigate the effects of Dunkard Township's

actions as to them.  (Pls.' App. Ex. D.)

Defendants note that Plaintiffs filed several other section 3 complaints against various municipalities in Greene County, Pennsylvania between 1993 and 1998.  (Defs.' App. Ex. A at 1.)  Plaintiffs settled section 3 complaints against Wayne Township, Jackson Township, and Rices Landing Borough; in particular, the violating parties in those cases paid Plaintiffs $13,000 for each complaint, for a total of $39,000.00.  (Munir Decl. ¶¶ 4-5.)[5]

In addition, as the result of a lawsuit in this Court at Civ. A. No. 99-2058 against Morgan Township, Plaintiffs were awarded $16,225.00 after a bench trial.  (Defs.' App. Ex. L.)  In total, Plaintiffs have already recovered over $55,225.00 as the result of section 3 violations.  (Munir Decl. ¶ 5.)  Defendants note that none of Plaintiffs' cases against Morgan Township, Wayne Township, Jackson Township and Rices Landing Borough involved an imposed resolution by the Agency.

Procedural History

Plaintiffs filed this action on July 14, 2008.  As noted, the complaint alleges a claim under the APA based on HUD's failure to comply with is own regulations because:

> HUD's imposed resolution, which includes opportunities for future contracts but does not include any monetary compensation to plaintiffs, does nothing to mitigate the consequences of the deficiency as our business no longer exists. HUD staff was very aware of this fact.  No other types of relief were ever suggested/recommended by HUD at any time during the resolution process.

(Compl. ¶ 13.)  They allege that their business's failure "is related to the inexcusably large amount of time HUD has taken to go through the grievance process" and contend that it is impossible for them to re-create their business at this time.  (Compl. ¶ 14.)  They allege that

---

[5]     Defs.' App. Ex. M.

HUD's actions are arbitrary and not in accordance with law.  (Compl. ¶ 15.)  As relief, they seek:

> a judgment that enjoins defendant HUD to include monetary compensation to plaintiffs, from recipient Dunkard Township as a result of their noted non-compliance, in the amount of $16,500, to mitigate the lost income to which plaintiffs were entitled plus all court costs and to grant such further and additional relief as may be just and proper.

(Compl. ¶ 17.)

On September 15, 2008, Defendants filed a motion to dismiss or, in the alternative, for summary judgment, citing Federal Rules of Civil Procedure 12(b)(1), 12(b)(6) and 56.  They argued that: 1) there is no subject matter jurisdiction because the APA's waiver of sovereign immunity does not extend to actions for which there is a remedy in court and Plaintiffs could file suit against Dunkard Township seeking monetary compensation; 2) no judicial review of HUD's imposed resolution is permitted because the agency acted within its discretion; 3) res judicata bars this action because the issue of lack of subject matter jurisdiction was raised and found dispositive in both Civ. A. No. 00-796 and Civ. A. No. 99-2058; and 4) HUD cannot direct Dunkard Township to award Plaintiffs monetary damages in any event, and thus the claims fails.

On November 18, 2008, an order was entered denying this motion, which was construed as a motion to dismiss for lack of subject matter jurisdiction or for failure to state a claim upon which relief could be granted.  The Court held that: 1) Defendants did not identify a means by which Plaintiffs could sue Dunkard Township, and at least two courts have concluded that no private cause of action is available to enforce § 1701u and that § 1983 may not be used to bring such a claim; moreover, Plaintiffs' grievance at this point was not against the Township but against HUD for its extraordinary delay and imposed resolution that failed to provide Plaintiffs with any relief; 2) Defendants did not support their argument that review of this matter was

foreclosed because HUD acted within its agency discretion; 3) res judicata would not apply based

on the prior case; and 4) to the extent that Defendants argued that HUD was not authorized to

compel CDBG or the Township to pay monetary compensation to Plaintiffs by way of remedy,

this argument had to be supported by evidence in an official form.  On February 2, 2009,

Defendants filed a motion for summary judgment.

Summary Judgment

Summary judgment is appropriate if, drawing all inferences in favor of the non-moving

party, "the pleadings, depositions, answers to interrogatories and admissions on file, together

with the affidavits, if any, show that there is no genuine issue of material fact and the movant is

entitled to judgment as a matter of law."  Fed.R.Civ.P. 56(c).  Summary judgment may be

granted against a party who fails to adduce facts sufficient to establish the existence of any

element essential to that party's case, and for which that party will bear the burden of proof at

trial.  Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  The moving party bears the initial

burden of identifying evidence which demonstrates the absence of a genuine issue of material

fact.  Once that burden has been met, the non-moving party must set forth "specific facts showing

that there is a genuine issue for trial" or the factual record will be taken as presented by the

moving party and judgment will be entered as a matter of law.  Matsushita Elec. Indus. Corp. v.

Zenith Radio Corp., 475 U.S. 574, 587 (1986).  An issue is genuine only if the evidence is such

that a reasonable jury could return a verdict for the nonmoving party.  Anderson v. Liberty-

Lobby, Inc., 477 U.S. 242, 248 (1986).

Defendants argue that: 1) the relevant statutory and regulatory framework does not permit

HUD to force Dunkard Township or the Commonwealth to pay money damages to the Plaintiffs;

8

2) HUD cannot offset future funds on the basis of past violations without notice and an

opportunity for a hearing; and 3) there was no APA violation because the Imposed Resolution

conforms to statutory and regulatory mandates.

Plaintiffs respond that: 1) neither the statute nor the regulation prohibits the imposition of

monetary sanctions and HUD formerly recognized this fact by listing them as an available option

in its Handbook; 2) they have never requested payment from federal funds and the fact that

proper notice and an opportunity for a hearing must be provided does not mean that HUD should

not take these procedural steps and offset DCED's future funds accordingly; and 3) HUD's

Imposed Resolution and grievance process were arbitrary, capricious and not in keeping with the

law.  Because Defendants' first argument is availing, the second and third arguments need not be

addressed.

HUD's Determination that it Could Not Compel Township to Pay Money Damages

Defendants contend that HUD has no authority to compel DCED to pay Plaintiffs

monetary damages arising out of Dunkard Township's failure to comply with section 3.

Plaintiffs respond that the regulations do not prohibit monetary damages as a remedy and that

HUD's conclusion that monetary damages are unavailable is not a reasonable one.  They also

note that the relevant Handbook expressly allows for them.

Section 3 of the Housing and Urban Development Act of 1968, 12 U.S.C. § 1701u,

requires that, in providing housing and community development assistance, HUD shall insure

that when contracts are awarded for housing rehabilitation, housing construction or other public

construction project, priority is given to "section 3 business concerns," which are businesses that

provide economic opportunities for low- and very low-income persons residing within the

9

metropolitan area (or non-metropolitan county) in which the assistance is expended.  See 12

U.S.C. § 1701u(d)(2).

Congress has given the Secretary of HUD authority to promulgate regulations with

respect to section 3 of the Act.  12 U.S.C. § 1701u(g).  The Secretary in turn has delegated this

authority to the Assistant Secretary for Fair Housing and Equal Opportunity.  24 C.F.R. § 135.7.

In its implementing regulations, HUD requires recipients of funds for housing and

community development programs to give priority to section 3 business concerns when

contracting for housing rehabilitation projects: "Recipients, contractors and subcontractors shall

direct their efforts to award section 3 covered contracts, to the greatest extent feasible, to section

3 business concerns...."  24 C.F.R. § 135.36.[6]

The language of the section 3 regulation that relates to consequences for violations states

that "[s]anctions that may be imposed on recipients that fail to comply with the regulations of

this part include debarment, suspension and limited denial of participation in HUD programs."

24 C.F.R. § 135.76(g).  The regulation further provides as follows: "Any resolution imposed by

the Assistant Secretary will be in accordance with requirements and procedures concerning the

imposition of sanctions or resolutions as set forth in the regulations governing the HUD program

under which the section 3 covered assistance was provided." 24 C.F.R. § 135.76(f)(2).

The CDBG regulation that addresses the consequences of programmatic deficiencies

states that "HUD may take one or more of the following actions to prevent a continuation of the

---

[6]     "Section 3 covered contract means a contract or subcontract (including a professional service contract) awarded by a recipient or contractor for work generated by the expenditure or section 3 covered assistance, or for work in connection with a section 3 covered project."  24 C.F.R. § 135.5.  Defendants do not dispute that the contracts awarded in this case were section 3 covered contracts.

deficiency; mitigate, to the extent possible, the adverse effects or consequence of the deficiency;

or prevent a recurrence of the deficiency." 24 C.F.R. § 570.495(a).  The regulation lists the

following possible actions that HUD may take:

> (1) Issue a letter of warning that advises the State of the deficiency and puts the state on notice that additional action will be taken if the deficiency is not corrected or is repeated;

> (2) Advise the state that additional information or assurances will be required before acceptance of one or more of the certifications required for the succeeding year grant;

> (3) Advise the state to suspend or terminate disbursement of funds for a deficient activity or grant;

> (4) Advise the state to reimburse its grant in any amounts improperly expended;

> (5) Change the method of payment to the state from an advance basis to a reimbursement basis;

> (6) Based on the state's current failure to comply with a requirement of this subpart which will affect the use of the succeeding year grant, condition the use of the succeeding fiscal years grant funds upon appropriate corrective action by the state. When the use of funds is conditioned, HUD shall specify the reasons for the conditions and the actions necessary to satisfy the conditions.

24 C.F.R. § 570.495(a).[7]

Thus, the regulation as written neither lists monetary sanctions as an option nor explicitly

prohibits this possibility.  However, Defendants maintain that the enumerated list of possible

actions all relate to insuring the state's compliance with programmatic requirements, not

reimbursement of individuals who have been aggrieved.  The six enumerated actions range in

---

[7]     Defendants note that HUD mistakenly cited the regulations for CDBG programs as 24 C.F.R. § 570.910 during the administrative processing of this case, but that this regulation covers only entitlement grants.  They observe that the substance of the regulation at § 570.495 does not change HUD's determination in this case.  (Hampton Decl. ¶¶ 16-17.)

severity from a letter of warning to the initiation of administrative proceedings to withhold funds, but none of the actions contemplates any type of mitigation for individual private complainants. Thus, Defendants maintain that the "mitigation" contemplated by § 570.495(a) refers to mitigation at the programmatic level, not with respect to individual grievants.

Defendants further contend they did attempt to "mitigate, to the extent possible" the damage Plaintiffs had suffered, but the extent possible did not include compelling the respondents to pay Plaintiffs monetary damages because the regulation's silence on the question of whether monetary sanctions are available left the matter to HUD's discretion and it has explained the basis for its ultimate conclusion that they are not. Staci Gilliam Hampton is the Director of the Economic Opportunity Division of the Office of Fair Housing and Equal Opportunity, who is responsible for implementing and enforcing HUD's efforts pursuant to section 3. (Hampton Decl. ¶¶ 1-2.) She explains that:

> In imposing a resolution, it is the Department's position that it cannot direct violators of section 3 to provide complainants remedies outside of those described in the regulations.
>
> Accordingly, since neither the section 3 statutory language nor the relevant regulations contemplate the payment of money to complainants as a remedy for violations of section 3, the Department is precluded from directing respondents to do so.
>
> The Department attaches significance to the absence of the mention of monetary compensation in the section 3 statute because there are other statutes which are enforced by the Department that specifically sanction monetary compensation to complainants.
>
> For example, Title VIII of the Fair Housing Act at 42 U.S.C. § 3612(g)(3), specifically provides for the award of actual damages to the aggrieved person and civil money penalties against the discriminating party.
>
> Similarly, the regulations relating to remedies in a Title VIII case specifically sanction the payment of money to complainants and the assessment of

civil money penalties against discriminating parties.  24 C.F.R. § 180.670(b).

> In contrast with the Title VIII regulations, neither the section 3 regulations at 24 C.F.R. § 135.76(g) nor the corresponding ... CDBG regulations at 24 C.F.R. § 570.495 specify that monetary compensation can be awarded to complainants for violations of section 3.

> ...

> Because Congress has specified that monetary compensation to complainants is available in the Title VIII context, but no such provision is present in the section 3 context, the Department's position is that the absence of any statutory language sanctioning monetary compensation for violations of section 3 precludes the Department from directing violators of section 3 to pay money to complainants.

> The Department applies this policy to all imposed resolutions issued in section 3 complaint investigations.

(Hampton Decl. ¶¶ 10-15, 18-19.)

In response to Defendants' motion to dismiss, Plaintiffs supported their contention that monetary sanctions were a viable alternative by submitting a section of HUD's Handbook, in which the following language appears under "Types of Relief":

> The types of relief that may be available to a grievant through the forms of conciliation agreements described above (see items 6. c.-e.) include but are not limited to:
>
> ○   new solicitation of bids/proposals;
> ○   award of contract;
> ○   job training position;
> ○   employment;
> ○   monetary compensation; and
> ○   affirmative action.

(Defs.' App. Ex. K at 5-18.)  The reference to items 6(c-e) includes "resolution through conference and persuasion," "conciliation," and, when informal methods of resolution fail, a formal resolution.  Id.

However, Staci Hampton explains that:

> Handbook 8023.1, which is entitled "Implementation of Section 3 of the Housing and Urban Development Act of 1968 as amended" was promulgated in July 1992.

> The regulations governing Section 3 were promulgated in June 1994, and thereby supersede any guidance outlined in the handbook.

> For example, the hearing process identified in paragraph 8 of page 5-18 in the July 1992 Handbook references 24 C.F.R. 135.110, a regulation which no longer exists.  This handbook provision is outdated and superseded by the provisions set forth at 24 CFR part 135.76(f)(2) of the June 1994 Regulation.  Specifically, the Department no longer offers hearings ... as a means of resolving Section 3 complaints.  In accordance with the June 1994 regulation, "where attempts to resolve the complaint informally fail, the Assistant Secretary will impose a resolution."

(Hampton Decl. ¶¶ 20-22.)

Plaintiffs note that an audit report prepared by the Office of the Inspector General in June 2003 recommended that HUD revise the Handbook, but this was never done.  (Pls.' App. Ex. M at 2.)  They argue that the 1994 regulations deleted the hearing process, but did not address other provisions in the Handbook, such as the option of monetary sanctions, which arguably may still apply.

HUD has demonstrated that the Handbook Plaintiffs have cited is outdated and has been superseded by subsequent regulations.  In addition, handbooks do not have the force and effect of law.  Mercy Catholic Med. Ctr. v. Thompson, 380 F.3d 142, 154 (3d Cir. 2004) (agency interpretive guidelines lack the force of law); Rank v. Nimmo, 677 F.2d 692, 698-99 (9th Cir. 1982) (agency handbooks and circulars are unenforceable).  Thus, even if the 1994 regulations did not explicitly overrule the Handbook by removing monetary sanctions as an available option, they unquestionably revised the legal landscape by creating a gap which HUD has filled.

Plaintiffs now indicate that they are not relying on the Handbook, but rather on "the statute and regulations relating to remedies for violations as well as corrective actions that provide 'mitigation, to the extent possible.'" (Pls.' Br. at 8.)[8]  They argue that HUD's position – that monetary relief is only available in voluntary compliance cases – is not a reasonable one.

Under the APA, federal courts are to "hold unlawful and set aside agency action, findings, and conclusions found to be – arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).  The statute does not require that HUD's actions be "reasonable" and the Court is not authorized to conduct a de novo review of how the agency handled this matter.  As the Supreme Court has stated, "the ultimate standard of review is a narrow one.  The court is not empowered to substitute its own judgment for that of the agency." Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 416 (1971), overruled in part on other grounds, Califano v. Sanders, 430 U.S. 99, 105 (1977).  Agency action may not be set aside if it is rational, which can be determined by examining whether the agency considered the relevant data and articulated an explanation establishing a rational connection between the facts found and the choice made.  Frisby v. United States Dep't of Hous. & Urban Dev., 755 F.2d 1052, 1055 (3d Cir. 1985).  The party challenging the agency's action has the burden of proof that it failed to meet the relevant standard.  Id.

The Supreme Court has held that "legislative regulations are given controlling weight unless they are arbitrary, capricious or manifestly contrary to the statute." Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 843-44 (1984).  Moreover, "[w]hen the construction of an administrative regulation rather than a statute is in issue, deference is even

---

[8]       Docket No. 26.

more clearly in order." <u>Udall v. Tallman</u>, 380 U.S. 1, 16-17 (1965).  <u>See also</u> <u>Facchiano Constr.</u>

<u>Co. v. U.S. Dep't of Labor</u>, 987 F.2d 206, 213 (3d Cir. 1993) ("[A]n administrative agency's

interpretation of its own regulation receives even greater deference than that accorded to its

interpretation of a statute.")

      As Defendants note, section 3 merely states that "the Secretary shall ensure" that, to the

greatest extent feasible, contracts awarded for work to be performed in connection with housing

rehabilitation, construction or other public construction projects are given to section 3 business

concerns. § 1701u(d)(2).  There is no particularized guidance as to what the Secretary must do to

meet this standard.  Rather, the statute merely directs the agency to promulgate implementing

regulations, thereby leaving gaps for the agency to fill and requiring appropriate deference by

courts to the gap-filling undertaken by the agency.

      Similarly, the language of the regulation lists sanctions that may be imposed, but

monetary sanctions are not one of the listed options.  24 C.F.R. § 570.495.  Staci Hampton is

responsible for implementing and enforcing HUD's efforts pursuant to section 3.  (Hampton

Decl. ¶ 2.)  She has concluded that the applicable regulation does not allow for the imposition of

monetary sanctions, a position based on the facts that: 1)  neither the statute nor the regulation

contemplates the payment of money to complainants as a remedy for violations of section 3; and

2) other statutes, such as Title VIII of the Fair Housing Act, 42 U.S.C. § 3612(g)(3), and its

accompanying regulation, 24 C.F.R. § 180.670(b), specifically provide for the award of actual

damages to the aggrieved person and civil money penalties against the discriminating party.

Thus, to the extent that Congress or the Secretary intended for section 3 grievants to receive

monetary compensation for violations, they could have provided for such a remedy but they did

not do so.

Moreover, she also states that:

> To the best of my knowledge, monetary compensation has never been awarded in an imposed resolution.  While page 5-18 of the handbook refers to "Types of Relief" and lists "monetary compensation" as a type of relief that may be available, the Department has consistently taken the position that monetary compensation is only available if the respondent agrees to pay it.

(Hampton Decl. ¶ 23.)  Thus, Plaintiffs cannot demonstrate that HUD's determination in their particular case was arbitrary, as it was consistent with the agency's long-standing policy.

Plaintiffs argue repeatedly that HUD should not "allow the violators to control and determine the type of relief awarded a grievant."  (Pls.' Br. at 2, 12.)  However, that is not what occurred in this case.  Rather, HUD imposed a resolution that placed requirements on the DCED, although this action did not reimburse Plaintiffs for the harm done to them or SCV.  Nevertheless, the record contains no evidence that "the violators" determined the relief.

Plaintiffs argue the statute and regulation "does permit HUD to sanction, debar or limit the participation of violators in federally funded projects.  HUD staff have mentioned these 'remedies' to Plaintiffs both in phone conversations as well as written correspondence."  (Pls.' Br. at 3) (citing Determination Letter).  However, the Determination Letter actually states that HUD may impose a resolution, "which could include limited denial of participation in HUD programs, suspension and/or debarment."  (Defs.' App. Ex. A at 2.)  "Sanctions," much less monetary sanctions, are not among the options listed.  In addition, as Defendants observe, suspension, debarment and limited denial of participation in HUD programs are tools designed to correct programmatic violations, not to address damages suffered by private plaintiffs.

Plaintiffs correctly note that the statute and regulation do not expressly prohibit HUD

from imposing monetary sanctions.  Defendants do not disagree as to this point.  However, they maintain that the applicable regulation's silence on the question leaves a gap that the agency is required to fill and that it has concluded that the regulation does not allow for the imposition of monetary sanctions.

Plaintiffs' position amounts to a policy argument that a better resolution would have been for the DCED to remunerate them for losses they suffered, a position with which HUD does not disagree.  But that argument does not mean that HUD was empowered to require the respondents to pay monetary sanctions or that the agency violated the APA when it came to the conclusion that it was not authorized under the relevant statute or regulation to impose this form of sanction.

HUD has proffered an interpretation of its own regulations and policies and has articulated an explanation establishing a rational connection between the facts found and the choice made and is therefore entitled to deference.  Levy v. Sterling Holding Co., LLC, 544 F.3d 493, 502 (3d Cir. 2008).  Given the lack of specificity in the statute, the Secretary was required to fill in the gap with implementing regulations, and given the failure of the Secretary to list monetary sanctions as an option in the regulation, HUD and its officials were acting within their right to fill in the gap and conclude that such sanctions were not contemplated.  Plaintiffs have not demonstrated that this position is arbitrary, capricious, an abuse of discretion or otherwise not in accordance with the law.

Therefore, Defendants' motion for summary judgment will be granted.  An appropriate order will be entered.


Dated: April 2, 2009

s/Robert C. Mitchell
ROBERT C. MITCHELL
United States Magistrate Judge

cc:    Julia Mannarino
       Ron Teska
       397 Hewitt Run Road
       Wind Ridge, PA 15380